**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Sea Island Comprehensive Health Care<br>Corp.,<br><br>                                    Debtor. | C/A No. 04-00788<br><br>Adv. Pro. No. 04-80044<br><br>Chapter 11<br><br>**ORDER** |
| Sea Island Comprehensive Health Care<br>Corp.,<br>                                    Plaintiff,<br><br>v.<br><br>William Pinder,<br>                                    Defendant. | |

THIS MATTER comes before the Court for trial upon the complaint (the "Complaint") filed by Sea Island Comprehensive Health Care Corporation ("Sea Island" or "Debtor") against William Pinder ("Pinder" or "Defendant") and the counterclaims ("Counterclaims") asserted by Defendant thereto. Having considered the record of the case including the pleadings, the arguments of counsel, and the testimony of witnesses, the Court makes the following findings of fact and conclusions of law.[1]

### FINDINGS OF FACT

1.      Debtor is a nonprofit corporation engaged in rendering various health related programs in the Charleston area.

2.      On January 22, 2004, Debtor filed for protection under Chapter 11 of the Bankruptcy Code.

---

[1]      The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

3.     On February 26, 2004, Debtor commenced this adversary proceeding by filing its Complaint against Pinder arising out of a dispute between Debtor and Pinder, its former President and Chief Financial Officer.  Debtor alleges that a certain prepetition promissory note (the "Note") and mortgage (the "Mortgage") encumbering certain real property of Debtor obtained by Pinder are void as the signatory on the Note and Mortgage did not have the authority to bind Debtor to the Note and Mortgage and further that the issuance of the Note and Mortgage was not authorized by Debtor.  Debtor further seeks to have the Note and Mortgage declared unenforceable because Defendant provided no consideration.  Debtor also pleads additional causes of action as follows:  (1) breach of fiduciary duty, (2) breach of employment contract, (3) breach of contract accompanied by a fraudulent act, and (4) fraud.[2]

4.     Despite the variety of the causes of action alleged, the relief that Debtor ultimately seeks is an order from this Court declaring that the pre-petition Note and pre-petition Mortgage issued to Defendant are void, invalid, unenforceable, and should be stricken from the public records as a recorded interest in Debtor's real property.

5.     On April 30, 2004, Defendant filed an answer and pleaded the following causes of action as Counterclaims against Debtor: (1) a judgment on the amounts owed under the Note, (2) foreclosure of the Mortgage on Debtor's property, and sale of the property, collections of amounts due on the Note, and a declaration of the Mortgage's priority, (3) an award of damages pursuant to S.C. Code Ann. §§ 41-10-10 through 100 for Debtor's failure to pay wages owed to Defendant, and (4) an award of damages pursuant to S.C. Code Ann. §§ 41-10-10 through 110 for Debtor's failure to pay pre-petition wages owed to Defendant as compensation for Defendant's accrued annual leave and sick leave.  Pinder contends the Note

---

[2]     The Complaint incorrectly numbers count six (6) as count seven (7).  However, there are only six (6) total causes of action alleged.

and Mortgage were issued to him in satisfaction of certain wages due him from Debtor for accumulated leave time, and Debtor contends, among other things, that Debtor did not authorize the issuance of the Note and Mortgage.

6.    Pinder concedes that there is no statement in the minutes of the meetings of the Board authorizing the issuance of a Note and Mortgage to him, and that there is no reference to the Note and Mortgage until after litigation had been commenced.[3]   It is undisputed that proper corporate procedure would have been for the Board to have adopted a formal resolution authorizing the execution of the Note and Mortgage, if such had been authorized, and an entry made memorializing the issuance.

7.    It is further undisputed that there had been no entries made in the accounting books and records of Debtor reflecting the issuance of the Note and Mortgage and no corresponding entries made into the leave records of Pinder.

8.    Pinder concedes that proper accounting procedures would have been to enter the Note and Mortgage into the financial records of Debtor at the time of issuance, make corresponding entries into the financial records to reflect payment of debt for which the Note was issued as well as into the leave records of Pinder, to create an action report for Pinder's personnel file, and to report the Note and Mortgage in the year-end accounting for Debtor. None of these procedures appear to have been followed.

9.    Certain minutes of the Board of Directors (the "Board") were admitted into evidence and provide guidance as to actions taken, or not taken, by the Board with respect to Pinder's accrued sick and annual leave as well as with respect to issuance of the Note and Mortgage.   Pinder testified that the Board approved the Note and Mortgage during a meeting

---

[3]    On March 6, 2001, Pinder brought two actions in the state courts of South Carolina, one seeking payment for wages allegedly due under the South Carolina Payment of Wages Act, and one seeking the foreclosure of the Mortgage and with respect to the Note.

held on August 26, 1999. Several members of Debtor's Board also testified as to whether the issuance of the Note and Mortgage to Pinder was approved by the Board.

10.    William Runyon, former counsel for the corporation for approximately twenty (20) years, testified that he prepared the Note and Mortgage as part of a possible settlement with Pinder on behalf of Debtor for accrued sick and annual leave Pinder alleged was owed to him. At or around the same time, the Board was considering requesting or suggesting that Pinder resign due to administrative problems with Debtor's operations, including decertification of its nursing home facility, friction between Pinder and certain regulatory agencies, and the non-payment of taxes due the Internal Revenue Service for a substantial period of time for which Pinder was apparently responsible. As a result, Runyon testified that he was directed to discuss with Pinder what sort of conditions Pinder would require in order for him to resign, and Pinder again raised his accrued sick and annual leave. Runyon further testified that the Note and Mortgage were contemplated to be part of an overall offer in compromise to the IRS, but that the approval of both the amount and the actual issuance of the Note and Mortgage needed to be presented to, and ultimately approved by, the Board via resolution. Runyon testified that he was present at the Board meetings upon which discussions concerning Pinder's accrued sick and annual leave were addressed, including the August 26, 1999 meeting referred to by Pinder, and that at no time did the Board approve the issuance of the Note and Mortgage to Pinder nor was a resolution drafted with respect to the issuance.

11.    Board members McKinley Washington (Chairman), William Knowles, and Robert M. Lee all indicated that there was no authorization from the Board to issue the Note and Mortgage to Pinder. In addition, Emily Smalls, secretary to the Board, indicated that

there was no authorization from the Board, and that in her experience, a resolution would have been drafted for issuance of a Note and Mortgage. All aforementioned parties were present at the August 26, 1999 Board meeting with the exception of Mr. Knowles. All testified that the accrual of Pinder's sick and annual leave were addressed at the August 26, 1999 meeting, and that they agreed to look into the matter further. Finally, Gwen Bennett, an employee of Debtor since 1996, formerly Debtor's Director of Human Resources and more recently its interim Chief Executive Director, researched the minutes of the Board meetings and found no mention of the Note and Mortgage in any of those Board minutes.

12.    In support of Defendant's position that the Board approved the issuance of the Note and Mortgage to him during the August 26, 1999 executive session Board meeting, Board member Thomas Johnson testified that the general consensus of the Board was that Pinder was owed money and that it appeared to be that payment could be in the form of a mortgage to Pinder. He did not testify, however, that an actual vote was taken by the Board for approval nor that a resolution was drafted authorizing the issuance of the Note and Mortgage.[4]

13.    The Board minutes of August 26, 1999 reflect that a motion was carried to accept an audit regarding Pinder's sick and annual leave and that the Board would work with Pinder on some type of payment plan.[5]

14.    Following the August 26, 1999 Board meeting, the minutes reflect that subsequent discussions took place with respect to Pinder's annual and sick leave on several occasions, and that a committee was formed to examine his accrued time.

---

[4]    Testimony of Board member Anne Richardson was submitted by deposition. Anne Richardson testified that she had authority to sign the Note, but no Board minutes, resolution or other documentation was presented in support.

[5]    Documentation reflecting the audit was never introduced into evidence.

15.    Both Debtor and Pinder presented testimony surrounding the issuance of the Note and Mortgage as well as events leading up to execution. Much of the testimony with respect to how the documents were signed was contradictory, causing this Court to parse through a voluminous amount of exhibits, and to reconcile as much testimony as possible, in order to ascertain the relevant sequence of events. As a result, it appears that two sets of the Note and Mortgage were executed on August 27, 1999. Both Mortgages, and apparently both Notes, were signed by Chairman of the Board McKinley Washington. Only one Note was submitted and entered as evidence.

16.    The first Mortgage was signed by McKinley Washington, witnessed by Emily Smalls and Gwendolyn Bennett. The second Mortgage and Note were the only documents entered into evidence at trial. The second Mortgage was signed by McKinley Washington and witnessed by Emily Smalls and an illegible name. The Note was also signed by McKinley Washington and witnessed by Anne Richardson as Secretary. Mr. Washington indicates that he was not aware that he was signing a Note and Mortgage for Pinder, and that he relied upon representations made to him that they were documents relating to the offer and compromise to be submitted to the IRS.[6]

17.    It appears that the two witnesses whose signatures are contained on the second Mortgage were not actually present at the signing of the Mortgage by Washington. It is unclear whether the witnesses were present at the signing of the first Mortgage.

18.    The second Mortgage was recorded by Pinder on May 19, 2000.[7]

---

[6]    Apparently the first set of the Note and Mortgage were re-drafted on the same day due to errors discovered following execution.
[7]    Subsequent to the trial, Pinder located the first executed Mortgage and submitted it for the Court's review. Pinder indicated that he was unable to locate another Note other than the one entered into evidence, but that one exists. Counsel for Pinder indicated at trial that it is the second Note and Mortgage that were entered into evidence.

19.    The amount of Pinder's accrued sick and annual leave, and his entitlement thereto, were also an issue at trial.   During the course of Pinder's employment, he was apparently at times unable to utilize his leave time.  It is undisputed that Pinder was subject to the terms of Debtor's Employee Personnel Manual except where otherwise directed. However, it is also undisputed that the Board made exceptions for Pinder in certain instances, including an action taken granting him thirty (30) days annual sick leave and thirty days annual vacation leave.

20.    As a result, there are several instances reflected in the minutes of the Board discussing Debtor's exemption for Pinder on any restrictions on leave time as set forth in Debtor's personnel manual.   On December 20, 1984, the Board exempted Pinder from restrictions on leave time indefinitely.  On May 28, 1987, the Board granted Pinder a waiver so that he could use his leave time at a later date or be compensated for it if money was available.  On March 26, 1992, Pinder requested and received approval to waive his vacation requirement.  On March 26, 1998, the Board minutes reflect that Debtor's personnel policies provide that staff can only accumulate a maximum of 240 hours, except in some case when a request for a waiver has been made such as in Pinder's case.

21.    At some point in time Pinder began redeeming his accumulated time.  It is undisputed on June 23, 1998, Pinder submitted a request to be paid for fifteen (15) days sick leave with the understanding that it would be counted as use of thirty (30) days sick leave. Pinder was issued a check for $5,259.48 in response.  It is also undisputed that on April 20, 1999, Pinder submitted a request for payment of thirty days of sick leave.   The request covered the period of March 1998 – March 1999.  On May 21, 1999, Pinder was issued a check in the amount of $9,462.08 in response.  There is also evidence in the record that Pinder

requested and obtained payment in the gross amount of $17,884.80 for 240 hours of "sick buyout" on March 30, 1999.

22.    Prior to the issuance of the Note and Mortgage, sometime around January – February 1999, Pinder requested and received approval from the Board of Directors for a salary increase from $135,000.00 to $155,000.00.  Shortly thereafter, in May 1999, Debtor's nursing home facility was decertified by the South Carolina Department of Health and Environmental Control.  Board members testified that the Board was to consider a reduction in Pinder's salary at the May 1999 Board meeting.  However, Pinder advised the Board that he had voluntarily reduced his salary to $95,000.00.  On May 24, 1999, Pinder prepared a memorandum directed to the Human Resource Director stating as follows:

> Effective immediately please effect an Employee Action Sheet reducing my salary to $95,000 per year.[8]  This reduction is deemed necessary in light of the decertification of the nursing home and the potential impact on the Corporation's ability to generate and sustain additional revenues in addition to maintaining costs as projected.
>
> If further changes are necessary I will contact you as soon as I am aware of them.

(footnote added).  In November 1999, at a critical time during which Pinder informed the Board that Debtor's outstanding tax obligations were mounting, that Debtor was having trouble paying its bills, and that Debtor was "on the brink of catastrophe",[9] Pinder instructed the Human Resources Director to increase his salary back to the pre-June level of $155,000.00/year, and to issue checks to pay the difference in the salary reduction taken from June to the date of restoration.  Several Board members testified that the Board was the only

---

[8]    It appears to have been the practice of Debtor to issue an "Employee Action Notice" to implement salary increases and bonus payments.  The record reflects Employee Action Notices with respect to Pinder's appointments, raises and bonuses spanning from 1980 to 1999.

[9]    Reflected in the Board minutes dated October 5, 1999.

entity that could authorize and effect a salary change, and that they did not authorize, nor

were they aware of, the salary increase or recoupment to Pinder.

23.    In January 2000, the Board accepted the resignation of Pinder. The conditions

of separation were delineated in the minutes of the Board meeting. No mention of Pinder's

accrued sick leave, vacation leave, nor the fact that Pinder had been issued the Note and

Mortgage were referenced in the minutes of the January 2000 Board meeting.

## CONCLUSIONS OF LAW

I.    **APPROVAL OF NOTE AND MORTGAGE BY CORPORATION**

Debtor first contends that the Note and Mortgage should be declared void inasmuch as

no action was taken by the Board approving the Note and Mortgage. Pinder argues that the

Note and Mortgage were approved by the Board and validly issued to him.

Generally, the rules and principles of evidence applicable to general civil actions are

likewise applicable in mortgage actions under South Carolina law, and the burden of proof

rests upon the party affirmatively asserting the issue in question. 27 S.C. Jur. § 121,

Evidence; sufficiency of proof (1996). See Paramount Fund, Inc. v. Cusaac, 282 S.C. 497,

319 S.E.2d 354 (S.C. Ct. App. 1984) (party seeking to foreclose on an unrecorded mortgage

had burden of proving existence of valid mortgage). See also Nichols v. Andrews, 146 S.E.

610, 611 (S.C. 1929) ("[o]rdinarily the production and proof of a bond and mortgage carries

with them the presumption of a valuable consideration which the obligor and mortgagor

pleading want of consideration assumes the burden of disproving."). Accordingly, as Debtor

is disputing the validity of the Mortgage (and Note), it would appear as though Debtor has the

burden of proving that they are void.

### The Mortgage

Pursuant to applicable South Carolina law, the general powers of a corporation include

the ability to mortgage all or any part of its property.  S.C. Code Ann. § 33-3-102(5) (Law.

Co-op. 1990 rev.); S.C. Code Ann. § 33-31-302(5) (West Supp. 2004).   It is generally

recognized that "[i]n order to mortgage property a domestic corporation must be in existence

and the mortgaging of corporate assets must be done pursuant to proper corporate authority."

Joby C. Castine, et al., Creation, Requisites, and Contents, 27 S.C. Jur. § 12 Mortgages,

Capacity of Parties (1996).  Proper corporate action is usually considered a resolution of the

Board of Directors. Id. S.C. Code § 33-31-801 provides as follows, in relevant part:

> all corporate powers must be exercised by or under the authority of, and the
> business and affairs of a corporation must be managed under the direction of, a
> board of directors.

S.C. Code Ann. § 33-31-801(b) (West Supp. 2004).  See also S.C. Code Ann. § 33-8-101

(Law. Co-op. 1990 rev.) (same for corporations generally).   Although the corporation's

articles of incorporation may direct otherwise, no evidence of such was presented to the

Court.  Accordingly, even with respect to nonprofit corporations, "the board has the ultimate

authority and responsibility."  Official Comment to S.C. Code Ann. § 33-31-801 (West Supp.

2004).  Further, § 33-31-824(b) provides that, in relevant part:

> (c) If a quorum is present when a vote is taken, the affirmative vote of a
> majority of directors present is the act of the board of directors unless this
> chapter, the articles, or bylaws require the vote of a greater number of
> directors.

S.C. Code Ann. § 33-31-824(b) (West Supp. 2004) (emphasis added).  Additionally, actions

may be taken outside of a meeting of a board of directors, but such action must be assented to

by all members and evidenced by one or more written consents signed by each director, and

included in the minutes filed with the corporate records reflecting the action taken. S.C. Code

§ 33-31-821(a) (West Supp. 2004) (emphasis added).

The necessity of authorization by the board of directors of a corporation in order to

encumber corporate assets appears to be long-standing. See Parker v. Carolina Sav. Bank, 31

S.E. 673 (S.C. 1898) (mortgage placed on corporate assets by president to secure debt without

any authority from directors or stockholders could not create valid mortgage or equitable

mortgage). More recent case law authority also implicates the necessity of a valid corporate

act to bind the corporation. In Orphan Aid Society v. Jenkins, the evidence presented

indicated that the president of the corporation did not have authority from its Board of

Managers to sign a subordination of a certain mortgage. 294 S.C. 106, 109, 362 S.E.2d 885,

887 (S.C. Ct. App. 1987). Due to the lack of proper corporate authorization, the

subordination was deemed invalid. Id. at 110, 362 S.E.2d at 887. See generally Kelly v.

Elgin's Paint & Body Shop (In re Elgin's Paint & Body Shop, Inc.), 249 B.R. 110 (Bankr. D.

S.C. 2000) (unilateral decision of officer to file bankruptcy petition absent authorization was

an unauthorized corporate act and warranted dismissal).

In the matter before the Court, Pinder admits that there is no reflection in the minutes

of any of the Board of Directors' meetings referencing the approval of the issuance of a Note

and Mortgage to him. He further acknowledges that corporate procedure would have been for

the Board to have adopted a formal resolution authorizing execution. No corresponding

entries were made into the accounting books and records of Debtor nor in the leave records of

Pinder reflecting payment for accrued leave time. Furthermore, five Board members or

individuals with direct knowledge of Board activities for the relevant time period testified that

there had been no Board vote, authorization, nor resolution regarding the Note and Mortgage.

There is no dispute that the Mortgage has been recorded, and Debtor raises no technical deficiencies in execution.[10]  Nevertheless, the Court is convinced, for the reasons stated above, that there was no corporate act or resolution authorizing the issuance of the Mortgage to Pinder, and the law appears clear based upon these facts that such an act is necessary.  Accordingly, the Mortgage instrument is void.

### The Note

Likewise, Debtor is not bound to the terms of the Note given the corresponding lack of authority by the Board to incur such liability.  See S.C. Code Ann. § 33-31-302(7) (West Supp. 2004) (corporation has power to incur liabilities); S.C. Code Ann. § 33-31-801 (West Supp. 2004) ("all corporate powers must be exercised by or under the authority of, and the business and affairs of a corporation must be managed under the direction of, a board of directors."); S.C. Code Ann. S.C. Code Ann. § 33-31-824(b) (West Supp. 2004) (majority vote of a quorum of the board of directors is needed for corporate act).

Additionally, South Carolina statutory law provides:

§ 36-3-404.  Unauthorized signatures.

---

[10]      It is evident from the record of the trial that the witnesses to the Mortgage were not present at the time of execution.  There is authority pursuant to both South Carolina and bankruptcy law which would call into question the validity of the instrument based upon such deficiency.  See Stelts v. Martin, 72 S.E. 550 (1911) (execution not having taken place in the presence of two witnesses invalidated mortgage, but may be considered equitable mortgage binding on the parties).  See also Joby C. Castine, et al., Creation, Requisites, and Contents, 27 S.C. Jur. § 8 General requirements [for Mortgages] in South Carolina (1996) ("a mortgage must be executed in the presence of two subscribing witnesses."); Annotations to S.C. Code § 30-5-30 (citing Attorney General Opinion No. 3990, p. 64 (1974-75), that two witnesses are still required to record deeds and mortgages unless affidavit provided).  Nevertheless, South Carolina authority also appears to provide that such deficiency may give rise to an equitable mortgage and/or may be binding as between the parties.  See Stelts, 72 S.E. at 551; 27 S.C. Jur. § 9 Mistakes in Execution ("A mortgage executed without witnesses or with incompetent witnesses is nevertheless valid between the parties.").  However, there is also bankruptcy authority that provides that the failure of the presence of two witnesses upon execution of a mortgage as required under applicable state law may provide for avoidance by a subsequent bona fide purchaser for value pursuant to 11 U.S.C. § 544(a)(3).  Zaptocky v. Chase Manhattan Bank, 250 F.3d 1020, 1024-25 (6th Cir. 2001) (failure of presence of two witnesses upon execution of mortgage, as required by Ohio law, renders the invalidly executed and may be avoided by a subsequent bona fide purchaser pursuant to 11 U.S.C. § 544(a)(3)).  Inasmuch as Debtor does not raise 11 U.S.C. § 544 as a cause of action for avoidance, and given South Carolina authority cited herein, the Court does not find it necessary to reach the issues surrounding the lack of the presence of witnesses during execution at this time, particularly in light of the ultimate conclusions reached by the Court in this decision.

(1)      Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

S.C. Code Ann. § 36-3-404 (Law. Co-op. 2003 rev.).  An "unauthorized signature" is defined as a signature made by an agent exceeding his actual or apparent authority.  S.C. Code Ann. § 36-1-201(43) (Law. Co-op. 2003 rev.).

Generally, a business act which charges nonprofit corporations with liability must be shown to have been authorized before liability will attach:

The general rule is that recovery cannot be had against either a nonprofit or a business corporation on commercial paper, unless the evidence warrants a finding not only that the paper was issued by the officers of the corporation, but that its issuance was authorized by the bylaws, or by resolution of the board of directors, or by a course of dealing by which the corporation held the officers out as authorized to issues the paper and would be deemed estopped from questioning their authority, or by ratification through the acceptance and retention of some benefit from the unauthorized act.

Fletcher Cyclopedia of the Law of Private Corporations, § 474 Executing Commercial Paper. Sufficient evidence has been presented that there was no authorization for execution of the Note, and no evidence of a course of dealing that would persuade the Court that principles of estoppel or ratification are applicable.

### *Binding Effect of Note and Mortgage Upon Corporation*

Although it appears that the lack of authority granted by the Board to incur liability based on the facts of this case is sufficient to render the Note and Mortgage void, the parties also have also raised in their Joint Pre-Trial Order as well as Debtor's post-trial memorandum/proposed order whether the doctrine of agency applies to bind the corporation to the acts of one of its Board members in signing the Note and Mortgage.  Accordingly, even though the Court has found a lack of approval by the Board for issuance of the Note and

Mortgage sufficient to render the instruments void, the Court will further consider whether the

signature of McKinley Washington, as Chairman of the Board of Directors, renders the Note

and Mortgage binding on Debtor based upon principles of agency.

In order to determine whether actions of a corporate agent bind the corporation, the

Court considers the law of agency.  The Official Comment to S.C. Code Ann. § 33-3-104,

addressing actions taken outside the scope of the power of a corporation generally ("ultra

vires" actions) provides, substantially analogous to the circumstances before the Court, as

follows:

> [T]his section does not deal with whether a corporation is bound by the action
> of a corporate agent if the action requires, but has not received, approval by the
> board of directors.  Whether or not the corporation is bound by this action
> depends on the law of agency, particularly the scope of apparent authority and
> whether the third person knew or should have known of the defect in the
> corporate approval process.

S.C. Code Ann. § 33-3-104 Official Comment.  With respect to nonprofit corporations, the

Official Comment to S.C. Code § 33-31-304 notes that ultra vires actions pursuant to the

statute do not "involve a claim by the corporation or a third party seeking to avoid liability on

the ground that the person acting on behalf of the corporation was not authorized to do so or

was acting beyond the scope of his agency or agency power."  Official Comment to S.C. Code

Ann. § 33-31-304 (West Supp. 2004).

"A party asserting agency as a basis of liability must prove the existence of the

agency, and the agency must be clearly established by the facts."  Orphan Aid Society v.

Jenkins, 294 S.C. 106, 109, 362 S.E.2d 885, 887 (S.C. Ct. App. 1987) (citation omitted).  See

also Pennell & Harley v. Hearon, 169 S.C. 16, 22, 168 S.E. 188, 190 (S.C. 1933) (same).

Similar to the facts set forth in Orphan Aid, based upon the evidence previously referenced,

McKinley Washington (nor Anne Richardson) did not have the actual authority to issue the

Note or Mortgage encumbering assets of Debtor or incurring liability on behalf of Debtor. 294 S.C. at 109, 362 S.E.2d at 887.  As previously discussed, in Orphan Aid, the lack of actual authority of the president of the corporation to sign a subordination of mortgage does not bind the corporation to that act.  Id.

If actual authority is not present, many courts will also consider whether the doctrine of apparent authority binds the principal to the acts of an agent.  Id.  The doctrine provides that the principal is bound by the actions of its agent when "it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority . . . ."  Id.  "The concept of apparent authority depends upon manifestations by the principal to a third party and the reasonable belief by the third party that the agent is authorized to bind the principal." Shropshire v. Prahalis, 309 S.C. 70, 71, 419 S.E.2d 829, 829-30 (S.C. Ct. App. 1992) (citing Orphan Aid Society, 294 S.C. at 109-110, 362 S.E.2d at 887) (no evidence principal did anything to make it appear as though agent had applicable authority).  See also 19 C.J.S. Corporations § 1000 ("authority of directors to bind the corporation belongs to them collectively and not individually; the mere fact that a person is a director or trustee gives him no authority to act individually.").

Considering Pinder's intimate involvement in Board actions and discussions, and considering the evidence in the record, including the minutes of the Board meetings, the Court is not persuaded that the manifestations by the Board regarding Pinder's accrued leave and re-payment of such could lead Pinder to reasonably conclude that Washington had the authority to issue the Note and Mortgage.  The drafter of the Note and Mortgage, former counsel for the corporation for twenty (20) years, testified that the Note and Mortgage needed to ultimately

be approved by the Board and that no such approval was ever voted on, nor was a corresponding resolution drafted. Several Board members testified that there was no authorization. In fact, the minutes of the Board dated August 26, 1999 reflect that the Board determine that a payment plan for Pinder would be <u>worked on by the Board</u>. There is no evidence that the Board delegated that authority to any one member, and the Note and Mortgage were signed the day following the August 26, 1999 meeting upon which the Board members determined to work on a payment plan. Further, subsequent Board meeting minutes indicate that there were discussions concerning monies owed, if any, to Pinder for accrued sick and annual leave. Again, there is no mention of the Note and Mortgage. Finally, the books and records of Debtor do not reflect the issuance of the Note and Mortgage and there is no corresponding satisfaction set forth for Pinder's accrued sick and annual leave.

Furthermore, Pinder has been an employee of Debtor, directly involved in its daily operations, with significant managerial responsibilities, for a substantial period of time. During that time, Debtor has been a Board member and conducted Board activities. As President and CEO, and as a highly educated Certified Professional Accountant, Pinder was surely aware of Board policies as well as the need for proper corporate action to bind the corporation to an encumbrance of its assets, particularly of such a large amount as well as to one of its own officers. Pinder should have been aware of the defect in the corporate approval process for the issuance of both the Note and Mortgage.

The Court is not convinced, based upon the evidence presented, that there are any actions of the Board or Debtor that would lead Pinder to reasonably believe that any one

Director had the authority to issue the Note and Mortgage.[11]  Accordingly, the existence of an

agency relationship between Debtor and Washington (or Richardson as a Board member that

attested to the Note) has not been clearly established by the facts sufficient to bind Debtor and

do not alter the determination that the Note and Mortgage are void for lack of proper

corporate authority.  Inasmuch as the relief ultimately sought by Debtor, pursuant to its prayer

for relief in its Complaint, is an order declaring the Note and Mortgage to be void, invalid and

unenforceable and directing that the said Mortgage be stricken, the Court need not address

Debtor's remaining causes of action alleging lack of consideration, breach of fiduciary duty,

breach of employment contract,  breach of contract accompanied by a fraudulent act, and

fraud.[12]  Nevertheless, the parties agreed in their Joint Pre-Trial Order that an issue that

remained to be litigated was whether Pinder was paid a greater salary than was authorized

such that Pinder may owe Debtor the overage amount.  This matter was litigated by the parties

at trial and appears to remain an issue based upon the parties' post-trial memoranda/proposed

orders.  Accordingly, the Court will consider whether Pinder was paid a greater salary than

that authorized by Debtor.

## II.    OVERPAYMENT OF SALARY

Debtor alleges that Pinder disclosed to the Board in May 1999 that he had reduced his

salary to $95,000.00 and, without Board approval, he increased his salary in November 1999

back to its original level of $155,000.00 and authorized payment of additional sums to

---

[11]    There is also insufficient evidence in the record that the Board ratified the execution of the Note and
Mortgage.  In fact, several Board members testified that they were not aware of the issuance of the Note and
Mortgage until after Pinder's resignation.

[12]    Debtor appears to have abandoned his pursuit for payment from Pinder of unauthorized corporate credit
card charges pursuant to its post-trial memorandum/proposed order by proposing that the Court sustain Pinder's
position.  In addition, the Joint Pre-trial Order indicates as facts remaining to be litigated are whether Pinder had
employees of Debtor perform his personal work for which Pinder did not reimburse Debtor and whether Pinder
incurred debt in the name of Debtor that was his own personal responsibility.  Neither of these issues were
addressed at trial nor in Debtor's post-trial memorandum/proposed order and also appear to have been
abandoned.

reimburse himself for the reduction during that time period. Pinder contends that he never disclosed to the Board his voluntary reduction in salary, and thus felt no duty to disclose to the Board his subsequent reinstatement and reimbursement of salary.

Debtor alleges that Pinder, as fiduciary, has an obligation of full disclosure to the corporation as well as a duty to exercise good faith. Pinder provides no legal analysis or authority with respect to this issue.[13]

South Carolina has codified the duty of care required of an officer and director. These statutes provide that, with respect to nonprofit corporations, as follows:

§ 33-31-841 Duties and authority of officers.

> Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties and authority prescribed in a resolution of the board or by direction of an officer authorized by the board to prescribe the duties and authority of other officers.

S.C. Code Ann. § 33-31-841 (West Supp. 2004). Further,

§ 33-31-842. Standards of conduct for officers.

> (a) An officer with discretionary authority shall discharge his duties under that authority:
>
> (1) in good faith;
> (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
> (3) in a manner the officer reasonably believes to be in the best interests of the corporation, and its members, if any.

S.C. Code Ann. § 33-31-842 (West Supp. 2004).[14] Further, the Official Comment to this Code section notes that "[i]n nonprofit corporations . . . full-time paid officers have important and significant duties and responsibilities." While no party cited the above-referenced statutory authority, nor asserted liability related thereto, the Court, while it need not directly

---

[13]   Pinder's post-trial memorandum/proposed order is completely lacking in any meaningful legal analysis as to this or any other legal issue to be determined by this Court.

[14]   Officers have the same general duty of care and loyalty as that of directors set forth in § 33-31-830.

find liability under these Code section,[15] notes that state law has recognized the duty of care and loyalty required of an officer of a corporation, including a non-profit corporation such as Debtor.    See also Benton v. Bakker (In re Heritage Village Church and Missionary Fellowship, Inc.), 92 B.R. 1000, 1014-15 (Bankr. D.S.C. 1988) (noting codification of duty of care of an officer and that such duty prohibits one from using the position for his own gain to the detriment of the corporation).

Three Board members, including the Chairman, specifically testified that Pinder had disclosed to the Board his reduction and salary, and one Board member testified that he had considered a greater reduction but that the Board accepted his reduction.  Further, the Board expected that the salary would remain at $95,000.00.  All three Board members testified that they did not authorize, nor were notified, of the subsequent reinstatement and reimbursement by Pinder, and the Chairman of the Board testified that he did not learn of Pinder's unilateral return in salary and reimbursement until recent litigation.   Testimony from these Board members elicited that proper procedure would have been for such an action to be approved by the Board, particularly when Debtor had lost a significant amount of its income due to decertification.

While Pinder's actions in unilaterally increasing his salary and reimbursing himself for the difference between his prior salary and reduced salary may not rise to the level of a fraud, conversion, or other criminal act, the Court is convinced that Pinder's unilateral increase and reimbursement were not authorized by the Board.  Considering the critical and financially tenuous situation of Debtor's finances at that time, as well as the fact that Debtor's nursing home had previously been de-certified, resulting in a substantial reduction of income output

---

[15]    Liability under § 33-31-842 has been limited by a three-year statute of limitations, to be extended in some circumstances.  The Court need not determine whether such an action would be or is barred.

of services, Pinder's reimbursement of salary was contrary to the best interests of Debtor and should have been not only disclosed to, but authorized by, the Board. Accordingly, Debtor is entitled to a return of those overpaid amounts not authorized by the Board to be paid to Pinder in the amount of $55,853.60.[16]

## III.    ACCRUED SICK AND ANNUAL LEAVE

Although the Court has found the Note and Mortgage to Pinder void, the Court separately considers Pinder's claim for accrued sick and annual leave. Pinder contends that Debtor owes him accrued sick and annual leave through October 1, 1998, and that the Note and Mortgage are a settlement of those amounts. He seeks separate payment for unpaid wages represented as sick and annual leave accumulated from October 1, 1998 to February 10, 2000.[17]

The Court finds sufficient evidence in the record that the Board, as well as Debtor, admitted to owing Pinder some amount for his accrued sick and annual leave and that Pinder had been, at some point in time, exempted from restrictions on accrual of leave. First, on December 20, 1984, Board minutes reflect that the Board exempted Pinder from restrictions on leave time indefinitely. On May 28, 1987, the Board granted a waiver so that Pinder could use his annual leave at a later date or be compensated for it if money available. On March 26, 1992, Pinder requested and received approval to waive his vacation requirement, and on March 26, 1998, the minutes reflect that "it was noted that staff could have a maximum of 240

---

[16]    Part of the record of the trial is a document generated by Debtor's Chief Financial Officer, compiled from Debtor's financial records, indicating the difference in wages from that understood by the Board as compared to that actually received by Pinder through March 20, 2000. The Court is satisfied that this document reflects the records of Debtor, and was attested to by Debtor's CFO that is familiar with Debtor's records as an accurate representation. Accordingly, the Court finds the figures provided reliable.

[17]    These are the dates represented by Pinder's post-trial memorandum/proposed order. His counterclaim reflects a different time period. Due to the discrepancy in evidence, including that presented at trial, Pinder's claim is limited to the time period set forth as represented in his post-trial memorandum/proposed order.

hours. Except in some cases when a request to waive has been made such as in Mr. Pinder's case."

Further, and perhaps most significantly, on August 26, 1999, the Board minutes indicate that the purpose of the "executive session" was to act on Pinder's sick and annual leave. The Board voted to accept a CPA firm's audit regarding Pinder's annual and sick leave and determined that the Board would "work with Pinder on some type of payment plan." Finally, Debtor's letter of counsel dated May 17, 2000, indicates that Debtor concedes some payment is due Pinder.

Accordingly, the Court is persuaded that the Board and Debtor acknowledged payment due Pinder for accrued sick and annual leave, and accepted the figures provided by the CPA audit. Although the Court was not provided these figures, former counsel for Debtor testified that he was directed by the Board to investigate the amounts due Pinder. He verified those figures with the accountant and averaged an hourly rate of pay for the relevant time periods. Pinder accepted these amounts. Accordingly, the $322,000.00 figure appears reasonable in light of the Board's tacit approval of the figures provided by the accountant, Runyon's authorization to discuss these figures with Pinder, and Pinder's acceptance of these amounts as testified to by Runyon as well as exhibited by the Note and Mortgage. The Court finds that Pinder is owed $322,000.00 for accrued sick and annual leave during his term of employment.[18]

---

[18]    Pinder did not file a proof of claim in Debtor's main case for payment of wages, and Debtor notes in his proposed order that Pinder's claim for payment of wages should thus be denied. However, in some instances courts have permitted informal proofs of claim to serve the same purpose as a timely and formally filed proof of claim. See In re Delacruz, No. 01-2118, 2002 WL 362755 (Bankr. D.S.C. Jan. 24., 2002); In re Elleco, 295 B.R. 797 (Bankr. D.S.C. 2002). Given the lateness in which Debtor seeks to pursue this position, as well as Pinder's filing of his Counterclaims prior to the bar date for filing proofs of claim as well as Pinder's activities during the case, the Court is inclined to recognize Pinder's claim for prepetition amounts due to him from Debtor. Id.

Pinder also alleges that he has accrued additional time for which sick and annual leave payment is due. Mr. Pinder failed to produce any convincing evidence to support the allegations of his claim for entitlement to payment for this time period. He further failed to satisfactorily explain payments received by him from Debtor for accrued sick and annual leave for certain periods in 1998 and 1999. Pinder introduced a sick leave request dated April 20, 1999, seeking payment for thirty (30) days of unused sick leave for the period March 1, 1998, through March 1, 1999. He was paid in response to that request. On June 23, 1998, Pinder submitted a request to be paid for fifteen (15) days sick leave with the understanding that it would be counted as use of thirty (30) days sick leave. Pinder was issued a check for $5,259.48 in response. There is also evidence in the record that Pinder requested and obtained payment in the gross amount of $17,884.80 for 240 hours of "sick buyout" on March 30, 1999. It is unclear what time periods these amount cover, and whether they reflect the same payment.

Given the lack of convincing evidence from Pinder exhibiting his entitlement to further amounts, the Court declines to award any further amounts due Pinder from Debtor. Pinder has failed to carry his burden of proof with regard to the allegations of his third Counterclaim.[19]

Accordingly, it is hereby

**ORDERED** that the Note and Mortgage are void; and it is further

**ORDERED** that Pinder owes Debtor $55,853.60 for unauthorized compensation; and it is further

---

[19]    Pinder's remaining Counterclaims have either been resolved herein or need not be addressed further based upon the findings and conclusions herein.

**ORDERED** that Pinder is owed $322,000.00 from Debtor representing full and complete satisfaction of all amounts due Pinder for accrued sick and annual leave, offset by the $55,853.60 Pinder owes Debtor, for a total prepetition unsecured claim in the amount of $266,146.40.

**AND IT IS SO ORDERED.**

_John E Waites_
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina,
January 18 , 2005